UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

EDGAR GLUCK, ET. AL.,

       Plaintiffs,              <u>MEMORANDUM AND ORDER</u>

  -against-                Civil Action No.
                                CV-07-4562(DGT)

EXECUTIVE RISK INDEMNITY, INC.

       Defendant.

-------------------------------X

Trager, J:

    This case arises out of a dispute regarding control over
Northern Services Group ("NSG").  NSG is a non-profit
corporation that manages nursing homes and assisted living
facilities.  It is associated with a religious congregation
known as Chevre Liady Nusach Hoary ("Chevre").  Plaintiffs
believe they were improperly expelled from the board of NSG
after NSG settled a dispute over its non-profit status with the
IRS.  This expulsion generated two law suits and a counterclaim,
all in state court ("the underlying actions").

    Defendant Executive Risk Indemnity, Inc. ("Executive Risk")
insured NSG and its board members as part of a directors,
officers and trustees liability policy ("DO&T policy").  As part
of this policy, Executive Risk is responsible for the legal
defense costs of current and former board members of NSG so long
as certain criteria are met.  The plaintiffs claimed coverage

for the costs they have incurred and will incur related to the underlying actions but Executive Risk denied their requests for coverage.  In this action, plaintiffs sue for a declaratory judgment to the effect that Executive Risk must cover their defense costs for the underlying actions, among other things.

Defendant has moved for summary judgment, requesting a declaration that it is not required cover plaintiffs' defense costs.  Plaintiffs have cross moved for summary judgment and request a declaration that defendant is required to cover their defense costs.  For the reasons stated below, defendant's motion for summary judgment is granted and plaintiffs' motion is denied.

**Background**

**(1)**

**The Closing Agreement between NSG and the IRS**

NSG is a non-profit corporation organized to manage various nursing homes and assisted living facilities.  Def. Ex. 7 at 1. NSG was originally founded as a not-for-profit corporation without any members.  Def. Ex. 19 at 6.  However, Chevre maintains that in 2004, NSG's bylaws and certificate of incorporation were amended to install Chevre as the sole member of NSG.  Id. at 6-9.  As explained further below, several board members dispute whether Chevre continues to be a voting member

of NSG following further amendments to NSG's bylaws in 2006.
Id.

In any event, as of 2004, NSG was a tax-exempt non-profit
under 26 U.S.C. § 501(c)(3). See Def.'s Rule 56.1 Statement
("Def. 56.1 St.") ¶ 4; Pl.'s Rule 56.1 Statement ("Pl. 56.1
St.") ¶ 4. The IRS, however, revoked this status in 2005 and
NSG challenged this revocation in federal court that July. Def.
56.1 St. ¶ 4-5; Pl. 56.1 St. ¶ 4-5.

Rather than litigate the dispute, the IRS and NSG decided
to settle the matter and agreed on terms (the "Closing
Agreement"). Def. Ex. 6. Under the Closing Agreement, the IRS
agreed that NSG would retain its § 501(c)(3) tax exempt status
as a non-profit. Id. at 15. In return, NSG was obliged to
enact governance reforms. Id. at 1-17. In particular, NSG
agreed to change the composition of its board to ensure that
eight of its thirteen directors were independent of Chevre and
the Rabbi in charge of Chevre and had not been an officer or
director of Chevre. Id. at 3. NSG also agreed to follow
specified procedures in setting board member and executive
compensation, including an independent audit to determine
whether the existing compensation was reasonable. Id. at 9-12.
The Closing Agreement was executed on April 7, 2006, and was
signed by Morris Klein, NSG's Executive Director. Id. at 16-17.

**The Underlying Actions and the Demand for Coverage**

About six months after the execution of the Closing Agreement, a battle for control of NSG erupted between Joseph Grunwald, then-Chief Financial Officer of NSG; Chevre, as NSG's sole member; and several NSG board members.  In December 2006, this battle led to two legal actions implicating the insurance policy issued to NSG by Executive Risk.  These actions, and the differing accounts of what led up to them, are described below.

**a. The First State Declaratory Judgment Action: <u>Chevre v. Grunwald</u>**

In November 2006, Chevre, NSG and three putative board members (collectively "Chevre") filed suit in state court against Grunwald and nine individuals they alleged had been removed from NSG's board.  <u>See</u> Def. Ex. 3 esp. ¶ 9-19 (hereinafter "<u>Chevre v. Grunwald</u>").  Chevre sought a declaratory judgment that the nine individuals were no longer NSG board members and had no authority to act on behalf of NSG.  <u>Id.</u> at ¶ 50.  For ease of identification, this group of purportedly terminated board members will be referred to as the "Disputed Board Members."  The facts listed in this section regarding the

nature of the <u>Chevre v. Grunwald</u> dispute are taken from the complaint in that action.[1]

The complaint first explained the events leading up to NSG's settlement with the IRS. Prior to the suit, NSG's non-profit, tax-exempt status had been repeatedly examined by the IRS, which had issued "adverse determination" letters. <u>Id.</u> at ¶ 23-33. Defendant Joseph Grunwald's actions were among the factors that caused the IRS to issue these adverse determination letters. <u>E.g.</u>, <u>id.</u> at ¶ 23-24, 28, 32. Grunwald was attempting to have NSG's non-profit status revoked so he could privatize it for his own benefit. <u>E.g.</u>, <u>id.</u> at ¶ 29. After extended negotiations, NSG was able to resolve its disagreements with the IRS and entered into the Closing Agreement, which imposed "certain governance requirements" on NSG in exchange for retention of its non-profit status. <u>Id.</u> at ¶ 35.

In November 2006, following the execution of the Closing Agreement, Grunwald declared that he wanted to retire from his duties at NSG and demanded that his "equity" in NSG be bought out. <u>Id.</u> at ¶ 36. The complaint explains that the plaintiffs – presumably the NSG board members bringing suit and/or representatives of Chevre – responded that such a buyout would

---

[1] As explained further <u>infra</u>, because the relevant legal standard for determining whether coverage exists centers on an analysis the four corners of each complaint/counterclaim, this background section focuses separately on the allegations contained in each.

(1) violate New York law regarding non-profit corporations and (2) violate the Closing Agreement. Id. at ¶ 37-38. After this, Grunwald stacked the board with individuals who wanted to change NSG's charitable purpose — i.e., with the Disputed Board Members. Id. at ¶ 39. This stacking resulted in a board that was not sufficiently independent and therefore violated the Closing Agreement. Id. at ¶ 40. Grunwald and the Disputed Board Members did this in order to cause NSG's tax exempt status to be revoked so that Grunwald could privatize the entities for his own benefit. Id. at ¶ 41.

Chevre then called a member meeting "to insure that the Board not take any action that would be in violation of its fiduciary duty to NSG's sole member [Chevre]." Id. at ¶ 42. At that meeting, Chevre used its authority as NSG's sole member to expel the Disputed Board Members. Id. at ¶ 44. However, the Disputed Board Members continued to attempt act on behalf of NSG, prompting Chevre to institute the declaratory action Chevre v. Grunwald to stop the Disputed Board Members from taking further actions that might harm NSG's not-for-profit status. Id. at ¶ 47, 49-50.

Chevre v. Grunwald was dismissed in December 2006 upon a finding that Chevre had failed to give adequate notice of the meeting where the Disputed Board Members were purportedly dismissed from the board. Pl. Ex. H at p. 2-3. Chevre then

held another meeting and again dismissed the Disputed Board
Members after providing notice.  Def. Ex. 12 at p. 1.


### b. The Second State Declaratory Judgement Action: <u>Gluck v. Chevre</u>

After Chevre's second meeting purporting to dismiss them,
the Disputed Board Members filed suit in state court,[2] on behalf
of NSG, against Chevre and NSG's Executive Director, Morris
Klein, on or about January 10, 2007.  Def. Ex. 4 at p. 1.  The
complaint in this second state court action, hereinafter "<u>Gluck
v. Chevre</u>," explained differently the dispute that transpired as
a result of the Closing Agreement.  The facts described below
are taken from this complaint.

Contrary to the allegations in the <u>Chevre v. Grunwald</u>
complaint that Grunwald purged NSG's board in order to have
NSG's non-profit status revoked or his equity purchased, the
<u>Gluck v. Chevre</u> complaint ascribed the changes in the

---

[2] The group of putative Board of Directors members who make up
"the Disputed Board Members" is comprised of slightly different
members for the purposes of <u>Gluck v. Chevre</u> as compared to
<u>Chevre v. Grunwald</u>.  In <u>Chevre v. Grunwald</u>, the Disputed Board
Members were Thomas Paneth, Paul Zickerman, Elisha Roseman,
George Margaretten, Marcel Gross, Abraham Kleinbart, Moshe
Gottesman, Bernard Rosenbloom and Leah Werner.  In <u>Gluck v.
Chevre</u>, Edgar Gluck and Yaakov Singer were added as plaintiffs
and Marcel Gross was removed.  However, for ease of identifying
the parties in the set of law suits at issue, the "Disputed
Board Members" is used to identify the largely overlapping
groups of board members that constituted the defendants in
<u>Chevre v. Grunwald</u> and that constitute the plaintiffs in <u>Gluck
v. Chevre</u> and in the instant action.

composition of NSG's board and its bylaws to a desire to preserve NSG's non-profit status and comply with the Closing Agreement. It first recited the history of the Closing Agreement and emphasized the necessity of complying with it to preserve NSG's financial viability. Def. Ex. 4 at ¶ 4. It stated, "[w]ere the Company to default under the Closing Agreement and lose its federal not-for-profit status, it could not continue in business. First, it would owe more than $10 million in taxes . . . ." Id. at ¶ 26.

The complaint went on to explain that the Closing Agreement barred Chevre's active involvement in NSG. It stated that the IRS at one point – although the time and place are not specified – informed NSG in writing that Chevre "inserting itself as a member of the Company and dismissing directors violates the Closing Agreement and thereby places the Company in jeopardy of losing its not-for-profit status." Id. at ¶ 4. Indeed, the Closing Agreement required that NSG's board contain at least eight independent board members – that is, board members not closely affiliated with Chevre – out of thirteen total members. Id. at ¶ 4, 28.

In June of 2006, two months after the Closing Agreement was executed, NSG's board took steps to "effectuate the Closing Agreement" by changing the bylaws so that they mandated the proportion of independent directors required by the Closing

Agreement.  _Id._ at ¶ 32.  However, after two of the original thirteen board members declined to serve, two new directors – both now Disputed Board Members – were elected by the board in November 2006 in compliance with the procedures set forth in NSG's amended bylaws and the Closing Agreement.  _Id._ at ¶ 34-35.

Because Morris Klein falsely told some board members that the Closing Agreement required Chevre to be a member, the board's June 2006 amendments to the bylaws included Chevre as a member of the corporation with but with no voting power.  _Id._ at ¶ 33.[3]  Then, in contravention of what the Disputed Board Members believed was Chevre's non-voting membership status, Chevre purportedly disbanded the board, removing the Disputed Board Members without notice, on November 20, 2006.  _Id._ at ¶ 36, 37. As a result of this allegedly invalid act, the Disputed Board Members, still acting as the board of NSG, removed Chevre entirely as a member of NSG at a November 30, 2006 meeting.  _Id._ at ¶ 41.  At this same meeting, another independent director resigned, an inside director was removed, and two new directors were appointed to fill these vacancies (now both Disputed Board Members).  _Id._ at ¶ 39-40.

---

[3] However, the Disputed Board Members assert that, contrary to what Morris Klein told them, Chevre's new status as a non-voting member was in fact invalid because Chevre was not permitted to be a member of NSG at all under the Closing Agreement.  _Id._ at ¶ 33.

The Disputed Board Members then held another board meeting at which they fired Morris Klein on December 7, 2006, because he had put the Closing Agreement in jeopardy by misleading the IRS, among other misdeeds.  Id. at ¶ 42, 48.  On December 27, 2006, Chevre held a second member meeting and again purportedly removed the Disputed Board Members from NSG's board, after proper notice.  Id. at ¶ 45-47.  This removal prompted the Disputed Board Members to file Gluck v. Chevre in state court, seeking a declaratory judgment that they are still members of the board, that Chevre is not a member of the corporation and that Morris Klein does not act on behalf of NSG.  Id. at ¶ 54.

c.    **The Counterclaim in Gluck v. Chevre**

In response to the Disputed Board Members' allegations in Gluck v. Chevre, Chevre and Morris Klein brought a counterclaim on January 31, 2007.[4]  Def. Ex. 5 ¶ 110.  The facts alleged in this counterclaim, which mirror those in the Chevre v. Grunwald complaint, are described below.

The counterclaim again alleges that NSG's tax difficulties were brought on, in part, because of the activities of Joseph Grunwald.  See, e.g., id. at ¶ 82.  It then emphasizes the

---

[4] Plaintiffs allege that Morris Klein has withdrawn from the counterclaim by filing an amended answer that does not set forth a counterclaim.  E.g., Pl. Mem. of Law in Supp. of Mot. for Summ. J. at 10.

portions of the Closing Agreement that required governance changes in NSG, including an examination of NSG's executive compensation. Id. at ¶ 90, 95.

Prior to the Closing Agreement, Grunwald was receiving over $600,000 in total compensation while working about ten hours per week for NSG. Id. at ¶ 96-97. Chevre and Klein told Grunwald he would have to increase his hours, reduce his compensation and refund any excess compensation. Id. at ¶ 98. Grunwald then demanded that his "equity" be purchased. Id. at ¶ 99. Chevre responded that such a purchase would violate New York non-profit law and the Closing Agreement. Id. at ¶ 100-01.

At this point, and at Grunwald's behest, NSG's board elected new membership that was not sufficiently independent to satisfy the requirements of the Closing Agreement. Id. at ¶ 102-04. In response, Chevre held a member meeting on November 20, 2006, at which it removed the Disputed Board Members in order to ensure that the board took no actions that were "in violation of the directors' fiduciary duties . . . ." Id. at ¶ 105-07. When the Disputed Board Members brought Gluck v. Chevre to challenge their removal, Chevre and Klein asserted the counterclaim, requesting a declaratory judgment that the Disputed Board Members were not directors and could not take any further action on behalf of NSG. Id. at ¶ 110. Both parties in Gluck v. Chevre moved for summary judgment. This was denied by

11

the New York trial court on September 19, 2007, on the grounds
that summary judgment was premature because more disclosure was
needed.  Def. Ex. 20 at p. 3.  As of yet, neither the claim nor
the counterclaim in Gluck v. Chevre has been resolved.

The Disputed Board Members are now seeking to have the
costs of both these state court law suits covered by Executive
Risk, under the terms of NSG's DO&T Liability Insurance policy.
For its part, Executive Risk claims that this policy contains
exclusions that excuse Executive Risk from coverage.  A
description of this policy is therefore in order.

**(3)**

**The Insurance Applications and the Terms of Coverage**

**a.    The Renewal Applications**

NSG maintained liability insurance for its board members
and officers through Executive Risk.   This insurance had to be
renewed each year.  See Pl. Ex. D.  In connection with this
renewal process, NSG was required to submit an application
which, among other things, posed a series of questions to NSG.
See id.  In its 2005 renewal application, NSG was asked: "Is
there any pending or anticipated challenge to the Applicant's
tax-exempt status under applicable law, whether federal, state
or local?"  Pl. Ex. D at I.5.  NSG checked "Yes," circled
"federal" and apparently listed the entities within NSG that

12

were subject to the challenge.  Id.  The 2005 renewal

application was signed by Morris Klein on June 10, 2005.  Id. at

p. 8.

The 2006 renewal application asked the same question.  Pl.

Ex. E at I.5.  This time, the answer was checked "No;" no

explanation was given.  Id.  The 2006 application also asked:

"Has any Entity proposed for this insurance entered into a

criminal or civil settlement with the United States or with some

party acting on behalf of the United States by which claims

against such entity were resolved?"  Id. at II.B.17.  NSG

answered "No." [5]  Id.  This application was signed by Klein on

June 1, 2006.  Id. at p. 8.  As noted above, Klein signed the

Closing Agreement with the IRS about two months earlier, on

April 7, 2006.  Def. Ex. 6 at p. 17.

---

[5] It is unclear why the 2006 application misstated the existence
of the Closing Agreement, particularly given that it might have
decreased, rather than increased, the risk of insuring NSG as a
not-for-profit, as it ended a challenge to NSG's not-for-profit
tax status.  However, no testimony or affidavit by Morris Klein
explaining the misrepresentation has been presented, and the
plaintiffs nowhere argue that the failure to disclose the
Closing Agreement was due to a failure to comprehend the
question.  Therefore, NSG appears bound by Klein's
misrepresentation.  See Curanovic v. New York Cent. Mut. Fire
Ins. Co., 307 A.D.2d 435, 437, 762 N.Y.S.2d 148, 150-151 (3rd
Dep't 2003) ("The signer of a contract is conclusively bound by
it regardless of whether he or she actually read it . . . . [And
an insured] has a duty to review the entire application and to
correct any incorrect or incomplete answers.") (internal marks
and citations omitted).

During discovery, the Disputed Board Members deposed Brook
Joiner, a claims attorney produced by Executive Risk to explain
its underwriting practices.  Pl. Ex. F at p. 4 ln. 2-15, p. 7
ln. 16.  Ms. Joiner was asked about the combined effect of the
answers on the 2005 and 2006 applications.  She was directed to
the fact that NSG's 2005 application indicated that there <u>was</u> a
pending or anticipated challenge to NSG's non-profit status and
then the 2006 application indicated that there <u>was no</u> pending or
anticipated challenge.  She was asked if these two answers,
viewed together, effectively indicated that a settlement had
been reached.  She answered that "[i]t indicates that there was
no longer a pending or anticipated challenge.  I'm not sure it
necessarily indicates that there was a settlement."  Pl. Ex. F
at p. 31 ln. 12-15.  She did not, however, give any further
information as to what else she thought it might indicate.  <u>Id.</u>

**b.   The Terms of the Policy**

The insurance policy in force at the relevant time has
several pertinent clauses.  In defining its coverage, the policy
indicates that it will pay "on behalf of the Insured Persons
Loss from Claims first made against them during the Policy
period . . . ."  Def. Ex. 1 at I.A; <u>see also</u> <u>id.</u> at Endorsement
1.  In an endorsement, the policy sets out a duty for the
insurer to defend the insureds for any claim, even if the claim

is false, fraudulent or groundless, up to the limit of liability.  _Id._ at Endorsement 14.  The policy also specifies that "'[l]oss' means any amount, including Defense Expenses . . . which an Insured is obligated to pay as a result of a Claim . . . ."  _Id._ at II.G.  "'Defense Expenses' means reasonable legal fees and expenses incurred by an Insured in defense of a Claim . . . ."  _Id._ at II.C.

The policy includes several other relevant definitions. "'Insured' means the Insured Entity and any Insured Person . . . ."  _Id._ at II.D.  An "'Insured Person' means any past, present or future director, officer, trustee . . . . of the Insured Entity . . . ."  _Id._ at II.F.  The "'Insured Entity' means the Parent Organization and any Subsidiary as of the Inception Date [as well as certain other Subsidiaries] . . . ."  _Id._ at II.E. In this case, the Parent Organization is NSG.  _Id._ at p. 8.

Of particular importance, the 2006 renewal application stated that "it is agreed that . . . any claim arising from any fact, circumstance, situation, transaction, event, act, error, or omission required to be disclosed in response to Questions 14, 15, 16, 17 or 21 is excluded from the proposed insurance." Def. Ex. 2 at p. 5.  The question on the 2006 renewal application that asked whether NSG had entered into any settlements with the federal government was question seventeen. _Id._ at I.17.  The policy itself incorporated the application by

indicating that "[t]he Insureds represent that the particulars and statements contained in the Application are true and agree that . . . those particulars and statements . . . are to be considered as incorporated into . . . this Policy . . . ." Def. Ex. 1 at IV.H.

Finally, the policy sets forth what is known as an "Insured vs. Insured" exception. It reads that "[t]he Underwriter shall not pay Loss, including Defense Expenses, for Claims: . . . . [made] by or at the behest of the Insured Entity, except that this exclusion shall not apply to any derivative action brought totally independently of, and without the solicitation, assistance, participation, or intervention of, any of the Insureds . . . ." Id. at III.B.3.

## Discussion

### (1)

### General Standards Governing Insurance Exclusions

In a contract dispute, summary judgment is only appropriate where the agreement's language is unambiguous. Sayers v. Rochester Tel. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993). Where an insurance contract provides for a duty to defend, that duty applies "whenever the four corners of the complaint suggest – or the insurer has actual knowledge of facts establishing – a reasonable possibility of coverage."

Cont'l Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d 640, 648, 609

N.E.2d 506, 509, 593 N.Y.S.2d 966, 969 (1993). Therefore:

> To be relieved of its duty to defend on the
> basis of a policy exclusion, the insurer
> bears the heavy burden of demonstrating that
> the allegations of the complaint cast the
> pleadings wholly within that exclusion, that
> the exclusion is subject to no other
> reasonable interpretation, and that there is
> no possible factual or legal basis upon
> which the insurer may eventually be held
> obligated to indemnify the insured under any
> policy provision. If any of the claims
> against the insured arguably arise from
> covered events, the insurer is required to
> defend the entire action.

Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins.

Co., 91 N.Y.2d 169, 175, 690 N.E.2d 866, 868-69, 667 N.Y.S.2d

982, 984-85 (1997) (internal quotations and citations omitted).

"[T]he court, in deciding whether an insurer has a duty to

defend, may consider extrinsic facts submitted by the insured to

show that coverage under a policy may exist. On the other hand,

the insurer cannot use extrinsic facts to show that there is no

coverage." Petr-All Petroleum Corp. v. Fireman's Ins. Co. of

Newark, N.J., 188 A.D.2d 139, 142, 593 N.Y.S.2d 693, 695 (4th

Dep't 1993) (citation omitted).

**Whether the Plaintiffs' Claims are Excluded from Coverage**

Defendant argues that it is not required to defend the plaintiffs because their claims fall under two policy exclusions. First, defendant argues that coverage is excluded by NSG's failure to disclose the Closing Agreement, which triggered the exclusion in the renewal application for claims "arising from" certain facts if NSG failed to disclose them in response to questions on the application. Second, defendant argues that coverage is excluded by the Insured vs. Insured exception, which excludes coverage for suits brought by or at the behest of the Insured Entity — NSG. Plaintiffs, for their part, argue that they satisfy the conditions for coverage and that no exclusion applies to their claims.[6] Because coverage is entirely excluded by the "arising from" exclusion, the other issues need not be discussed.

**a. "Arising from"**

As noted above, the 2006 renewal application stated that "it is agreed that . . . any claim arising from any fact,

---

[6] Although plaintiffs allege that defendant initially indicated that coverage would be present for part of the underlying litigation, plaintiffs do not argue defendant has waived either of the primary coverage exclusions at issue here. Moreover, plaintiffs specifically state that they are not arguing for coverage based on estoppel. Accordingly, neither of these issues will be discussed further.

circumstance, situation, transaction, event, act, error, or

omission required to be disclosed in response to Questions 14,

15, 16, 17 or 21 is excluded from the proposed insurance."  Def.

Ex. 2 at p. 5.[7]  Question seventeen of the 2006 application

asked: "Has any Entity proposed for this insurance entered into

a criminal or civil settlement with the United States or with

some party acting on behalf of the United States by which claims

against such entity were resolved?"  Id. at II.B.17.  To this

question, NSG answered "No."  Id.  Based on these facts,

defendant argues that plaintiffs were required to disclose the

Closing Agreement and failed to do so.  Defendant further

contends that, per the terms of the "arising from" exclusion,

the claims at issue here arise out of the Closing Agreement and

---

[7] The text of this exclusion is not, in one respect, a model of
clarity.  Read literally and in isolation, it would appear to
exclude claims arising from anything that should be disclosed in
response to the listed set of questions — whether or not it
actually was disclosed.  Cf. St. Paul Fire & Marine Ins. Co. v.
Sledjeski & Tierney, PLLC, No. 08-CV-5184, 2009 WL 2151425, at
*4 (E.D.N.Y. July 17, 2009) (finding that the prior knowledge
exclusion in that case allowed insurer to disclaim coverage even
for a reported risk, because "the language of [the exclusion]
makes no reference to the issue of notification . . . . [The
exclusion] does not depend on whether or not notice of the
alleged error was provided . . . prior to the inception date.").
If the clause here were interpreted this broadly, it would not
matter whether plaintiff had "effectively disclosed" the Closing
Agreement — whether disclosed or not, coverage would be barred
for claims arising from it.  However, defendant does not argue
for this broader interpretation of the clause and, in any event,
it is clear that plaintiffs did not disclose the Closing
Agreement.  Therefore, the issue of whether the defendant could
disclaim coverage if the Closing Agreement had been disclosed is
not presented.

are therefore not covered.  Each of these arguments will be
considered in turn.

### i. Whether Plaintiff Effectively Disclosed the Closing Agreement

In response to defendant's contention that plaintiffs
failed to disclose the Closing Agreement, plaintiffs make three
arguments.  First, they argue that NSG effectively did disclose
the Closing Agreement.  Plaintiffs note that the NSG's answer to
question five on the 2005 renewal application disclosed that
there was a pending or anticipated challenge to NSG's non-profit
status.  Pl. Ex. D at I.5.  NSG's answer to question five on the
2006 application, by contrast, indicated that there was no
pending or anticipated challenge to NSG's non-profit status.
Pl. Ex. E at I.5.  Plaintiffs argue that the only plausible
explanation for the two responses is that a challenge to NSG's
non-profit status was raised and settled.  Moreover, they argue
that the deposition testimony of Ms. Joiner supports this
interpretation. Accordingly, plaintiffs contend that defendant
was on notice of the Closing Agreement.

This argument is wide of the mark, most obviously because
even if this series of answers should have put Executive Risk on
notice that it needed to ask whether or not there had been a
settlement, the application did precisely that.  Executive

Risk's renewal application specifically asked in question seventeen whether there had been any settlements with the government, and NSG responded "No."  Pl. Ex. E II.B.17.

Moreover, this argument assumes that the "Yes" answer to the question of whether there was a pending or anticipated challenge to NSG's non-profit status in 2005, coupled with the "No" answer in 2006, clearly indicated a settlement.  However, a challenge to an organization's non-profit status could end without a settlement.  The IRS could simply drop the challenge after finding that it was unsubstantiated.  Similarly, an anticipated challenge, which would also prompt a "Yes" answer to question five of 2005 application, could simply fail to materialize.  Either of these circumstances would yield the same pattern of answers that NSG gave to question five: a "Yes" on the 2005 application and a "No" on the 2006 application. Moreover, Ms. Joiner testified at her deposition that these two answers would not necessarily indicate that there was a settlement.  Pl. Ex. F at p. 31 ln. 12-15.  Therefore, this sequence of answers did not put defendant on notice of the Closing Agreement.

Second, plaintiffs argue that their answers on the 2005 and 2006 renewal applications put defendant on a duty of inquiry regarding the possibility of a settlement.  In one version of this argument, plaintiffs claim that the answers on the 2006

renewal application constituted an omission that defendant waived by failing to inquire. _See Philadelphia Indemnity Insurance Company v. Horowitz, Greener & Stengel, et. al._, 379 F. Supp. 2d 442, 453 (S.D.N.Y. 2005) (finding, under New York law, that "where upon the face of an insurance application, a question appears to be not answered at all, or to be imperfectly answered, and the insurers issue a policy without further inquiry, they waive the want or imperfection in the answer, and render the omission to answer more fully immaterial") (internal marks omitted); _see also Axis Reinsurance Co. v. Bennett_, Nos. 07 Civ. 7924, 08 Civ. 3242, 2008 WL 2485388, at *11–12 (S.D.N.Y. Jun. 19, 2008) (finding that where question in insurance application was not answered at all and insurer did not follow up, insurer waived objection to coverage based upon failure to answer).

This rule, however, is inapplicable to the facts of this case. _Philadelphia Indemnity_ found that there was a duty of inquiry when the insurer was faced with an omission, not an affirmatively false statement. Here, NSG's answer to question seventeen on the 2006 renewal application was not incomplete — it was affirmatively false. It said there had been no settlement when, in fact, there had been a settlement. Pl. Ex. E II.B.17. This outright falsity did not create a duty of inquiry. _See Philadelphia Indem._, 379 F. Supp. 2d at 454 ("[A]n

insurer is entitled to rely on the representations of the insured and . . . is under no duty to investigate the truthfulness of the representations.") (quoting collected cases).

In another version of this argument, plaintiffs argue more generically that defendant had reason to follow up and ask for more information.  They invoke the principle that courts "equate the knowledge the insurers could have gained through reasonable inquiry with actual knowledge of facts sufficient to defeat their right to rescind."  Foremost Guar. Corp. v. Meritor Sav. Bank, 910 F.2d 118, 127 (4th Cir. 1990).  This principle, however, requires that the insurer have a reason to undertake further inquiry in the first place.  See id. (finding no right to rescind a policy on the grounds that "insurers' possession of the placement memorandum provided the reason to inquire and a reasonable inquiry would have disclosed the misrepresentations.").

In our case, defendant had no information that should have caused it to inquire further than it did.  As noted above, plaintiffs' answers on the 2005 and 2006 renewal applications could be explained by either an anticipated challenge to NSG's non-profit status that never materialized or by a challenge in which NSG prevailed.  Each of these is entirely plausible and neither would raise suspicion, particularly when coupled with a

specific inquiry into whether there had been a settlement, to which the response was "No." Thus, defendant neither knew nor should have known of the settlement agreement.

Third, plaintiffs argue that even if NSG did not inform the defendant of the Closing Agreement and even if defendant had no reason to inquire further, NSG's answer still cannot deprive them of coverage because it was not material. For its part, defendant argues that the materiality inquiry has no place in interpreting exclusions.

Plaintiffs base their materiality argument on a New York statutory provision providing: "No misrepresentation shall avoid any contract of insurance or defeat recovery thereunder unless such misrepresentation was material." N.Y. Ins. Law § 3105(b) (McKinney 2009). Defendant is not trying to avoid, i.e., rescind the insurance policy at issue here, but plaintiffs believe that defendant is also prohibited from "defeating [their] recovery" under the policy unless their misrepresentation was material.

Defendant, however, is correct that the materiality inquiry appears to have no place in a determination of whether or not a particular exclusion applies. Instead, an insurer in defendant's situation has two separate affirmative defenses available to it: first, that a particular exclusion serves to bar the claim at issue (as defendant is claiming); and second,

that a material misrepresentation should allow the insurer to

avoid paying entirely on a contract (which defendant is not

claiming).  To be sure, the language of the statute, that no

misrepresentation should "defeat recovery" unless it is

material, might be interpreted to apply both in rescission cases

and in determining whether recovery under a particular contract

is possible.[8]  However, this language should not be read to

---

[8] Despite the potentially broad applicability of the statute,
numerous cases applying New York law have treated these two
affirmative defenses separately, albeit without an analysis of
the statutory language, and have found that specific exclusions
can operate to bar a claim irrespective of whether or not a
material misrepresentation was made in the insurance
application.  See XL Specialty Ins. Co. v. Agoglia, Nos. 08-CV-
3821, 08-CV-4196, 08-CV-5252, 2009 WL 1227485, at *6-10
(S.D.N.Y. April 30, 2009) (analyzing whether prior knowledge
exclusions – similar to the one at issue here – prevented claim
based on known but undisclosed facts without conducting inquiry
into materiality of those facts); Axis Reinsurance Co. v.
Bennett, 2008 WL 2485388, at *12-15 (finding question of fact as
to whether exclusion disclaiming coverage for "claims of which
any insured had knowledge" was part of policy, but further
finding that if it was, it could be used to deny coverage); Home
Ins. Co. of Ill. v. Spectrum Info. Techs., Inc., 930 F. Supp.
825, 835-41, 848-49 (E.D.N.Y. 1996) (analyzing separately
whether contract could be rescinded based on material
misrepresentation, or alternately whether coverage was precluded
by any of the exclusions in the policy); Barkan v. New York
Schools Ins. Reciprocal, 65 A.D.3d 1061, 1063-64, 886 N.Y.S.2d
414, 418 (2d Dep't 2009) (analyzing separately whether insurer
could rescind on the basis of a material misrepresentation, or
alternately whether insurer had clearly demonstrated that an
exclusion applied); Waters v. New York Property Ins.
Underwriting Ass'n, No. 117342/03, 2005 WL 2934822, at *2 (Sup.
Ct. N.Y. County Sept. 29, 2005)(finding that a misrepresentation
on an application placed the claim within an exclusion without
addressing materiality, and separately finding that insurer was
entitled to rescind the contract on the basis of the materiality
of the misrepresentation); Fed. Ins. Co. v. Tyco Intern. Litd.,

extend a materiality requirement to contractual exclusions,
because excluded claims are, by prior agreement, not part of the
insurance contract.  See Tyco Intern. Litd., 2004 WL 583829, at
*6 ("[An] insurer has no duty [to defend] if, as a matter of
law, the allegations in the complaint . . . fall within a policy
exclusion."); see also Miller v. Am. Eagle Fire Ins. Co., 253
N.Y. 64, 67, 170 N.E. 495, 496 (1930) ("The insurance company
may be strictly held to its policy; its contract may even be
liberally construed in favor of the policyholder, but the losses
which it has specifically excluded cannot be brought within the
insurance by a ruling of the courts.").

While no case has directly grappled with this issue,[9]
legislative history confirms that exclusions are not subject to

_____

No. 600507/03, 2004 WL 583829, at *4-6 (Sup. Ct. N.Y. County
March 5, 2004) (analyzing separately the issues of whether an
exclusion applied to bar coverage or whether a claim of
rescission due to material misrepresentation allowed insurer to
avoid paying defense expenses).

[9] The case that comes closest to addressing whether materiality
applies to exclusions is Guideone Specialty Mutual Ins. Co. v.
Congregation Adas Yereim, a recent Eastern District of New York
decision.  593 F. Supp. 2d 471, 486 (E.D.N.Y. 2009).  There, it
was determined that Insurance Law § 3105 applies only when an
insurer is seeking the remedy of rescission.  Id.  In that case,
an insurer sought to avoid liability for a particular claim
under an insurance contract by claiming that a material
misrepresentation in the contract allowed it to disclaim an
obligation to pay a claim arising from that misrepresentation,
even if the contract was not voided.  Id.  The court disagreed,
and found that § 3105(b) provides only the remedy of rescission
in response to a material misrepresentation, not the remedy of
disclaiming coverage: "Where an insurer complains . . . about

26

the materiality inquiry of Insurance Law § 3105 or § 3106.[10]

During a 1938 public hearing on the proposed bill that

eventually added sections 3105 and 3106 to New York's Insurance

Law, one participant expressed concern that the addition of a

materiality requirement for warranties might "deny the

application of any exclusion in [a] policy as a straight

exclusion."  Transcript of Public Hearing, Joint Legislative

---

misrepresentations, New York law arms the insurer only with the
hatchet of rescission and not the scalpel of unilateral
modification."  Id.  The court noted that New York law
separately empowers an insurer "to disclaim coverage for
particular occurrences without having to establish its right to
rescind or to invalidate the entire contract," through policy
exclusions.  Id.  In sum and substance, though in a different
context, this conclusion amounted to a finding that exclusions
are not subject to the materiality inquiry of § 3105.

Plaintiffs cite Slevin v. Amex Life Assurance Co., 695 F. Supp.
712 (E.D.N.Y. 1998), in support of their position that NSG's
misrepresentation must be found material before an exclusion
should apply.  However, Slevin did not deal with an exclusion,
but rather with the typical materiality question of whether an
insurer could rescind its contract and return the premiums paid
in order to avoid paying under a life insurance contract on the
basis of a misrepresentation in the insured's application.  See
id. at 713-14.

[10] Section 3106 extends a similar materiality requirement in the
case of warranties made in insurance contracts: "A breach of
warranty shall not avoid an insurance contract or defeat
recovery thereunder unless such breach materially increases the
risk of loss, damage or injury within the coverage of the
contract."  N.Y. Ins. Law § 3106(b) (McKinney 2009).  In
practice, however, the category of warranties in insurance
contracts has largely been subsumed by representations, as
another provision of the insurance law mandates: "All statements
made by, or by the authority of, the applicant for the issuance,
reinstatement or renewal of any such policy or contract shall be
deemed representations and not warranties."  Id. at § 3204(c).

Committee for Recodification of the Insurance Law, dated Nov. 18, 1938, Bill Jacket, ch. 882, L. 1939, at 664. The Chairman of the Committee on Insurance Law Revision responded: "No, absolutely not . . . . There is no limitation on exclusion . . . . As long as you are excluding certain causes of loss, then what you say is 'I will pay if loss occurs due to certain causes other than these,' but if you say 'I will pay if certain facts do not occur which might increase the risk of loss' although they do not cause it [then materiality will apply]." Id. at 664-65. This excerpt of legislative history makes clear that the amendments to the insurance law were not intended to subject exclusions written into insurance contracts to the materiality test.

This history also elucidates why exclusions differ from misrepresentations such that they fall outside the ambit of section 3105. The transcript illustrates that the purpose behind the materiality provision was to stop an insurer from ex post disclaiming an insurance contract, which proved to be a bad deal only in hindsight, by nitpicking the insurance application for minor misrepresentations unrelated to the claim for which coverage was being sought.[11] See id. at 662-64. The law

_____

[11] The specific dialogue illustrative of this purpose was:
    Mr. Harbison: Supposing a man says that he is a clerk, when in fact he is a salesman. It would be very difficult to prove you would not have issued this policy to this man.

therefore requires that if an insurer is making a general
disclaimer of coverage based on a misrepresentation, this
misrepresentation must have been material enough that knowledge
of it would have altered the terms of the contract.  See id.
(explaining that materiality will apply if an insurer is seeking
to avoid paying by arguing that a certain misrepresentation
increased the general risk of loss, although it did not cause
the specific loss being claimed for).

An exclusion, however, is different from an attempted ex
post disclaimer of coverage.  By including an exclusion, an
insurer makes clear to the insured that any claim that arises
from a particular fact will not be covered by the contract,
whereas other claims are free to proceed.  See id. (explaining
that an insurer can still write in exclusions that state that
certain causes of loss will not be covered under the contract).
These exclusions are bargained-for contractual arrangements, and
an insured is on notice before the contract is entered that such
exclusions are not part of the coverage provided for the premium
paid.  Cf. Inavest Enters. v. TRW Title Ins. of New York Inc.,
189 A.D.2d 111, 113, 595 N.Y.S.2d 837, 838 (3d Dep't 1993)

---

Mr. Patterson:  Why should you escape liability unless you
can establish that?
    Mr. Harbison:  Why shouldn't he in heaven's name tell the
truth?
    Mr. Patterson:  Why should you object unless you are hurt
by it?
Id. at 663-64.

(exclusion in a title insurance contract was a "bargained for" liability "voluntarily assumed by plaintiff").  Thus, in contrast to situations where a claim, by the plain language of the contract, would be covered except that an insurer later alleges a material misrepresentation somewhere in the contract, exclusions let the insured know up front that claims arising from certain facts are not covered.  This distinction seems to have convinced both the drafters and potential opponents of Insurance Law sections 3105 and 3106 that the materiality requirement would not extend to contractual exclusions.  See Transcript of Public Hearing, at 663-64.

The conclusion that the materiality of NSG's misrepresentation in this particular case must be ignored is somewhat frustrating.  Indeed, it seems quite possible that Executive Risk would have issued the same policy to NSG if the Closing Agreement had been disclosed, as a settlement securing NSG's non-profit tax status might have reduced NSG's riskiness. Nevertheless, for the reasons explained above, the exclusion at issue here must be given effect by its own terms, and without reference to materiality, to the extent that it is clearly written and unambiguous.  See Kimmins Indus. Service Corp. v. Reliance Ins. Co., 19 F.3d 78, 81 (2d Cir. 1994) ("In order to be enforced, exclusions or exceptions from policy coverage must be specific and clear; they are not to be extended by

interpretation or implication.") (internal quotation marks omitted); see also Greater New York Mut. Ins. Co. v. U.S. Underwriters Ins. Co., 36 A.D.3d 441, 442, 827 N.Y.S.2d 147, 148 (1st Dep't 2007) ("It is well established that when interpreting an insurance contract, as with any written contract, the court must afford the unambiguous provisions of the policy their plain and ordinary meaning . . . .").  The "arising from" exclusion contained in the Executive Risk application — and incorporated into the contract — states:

> [I]t is agreed that . . . any claim arising from any fact, circumstance, situation, transaction, event, act, error, or omission required to be disclosed in response to Questions 14, 15, 16, 17, or 21 is excluded from the proposed insurance.

Def. Ex. 2 at 5 (emphasis added).  This exclusion plainly eliminates coverage for claims arising from those facts, etc. "required to be disclosed" that are not actually disclosed in response to the specified questions.  Plaintiffs do not challenge that the existence of the Closing Agreement was a fact "required to be disclosed" in response to question seventeen. Thus, NSG's failure to disclose the agreement places claims "arising from" the Closing Agreement within an exclusion to NSG's DO&T policy.

**ii. Whether Plaintiffs Request for Coverage "Arose From" the Closing Agreement**

It remains for defendant to show that the claims asserted by plaintiffs arose from the Closing Agreement. The term "arising from," or synonymously "arising out of," [12] should be interpreted as narrowly as possible in an insurance exclusion, because any ambiguities in insurance contracts should be resolved in favor of the insured. See M.H. Lipiner & Son, Inc. v. Hanover Ins. Co., 869 F.2d 685, 686 (2d Cir. 1989) (applying New York law) ("Exclusionary clauses are given the interpretation most beneficial to the insured."); 2 Insurance Claims and Disputes 5th § 11:22 (2009) (explaining, in the context of exclusions related to automobile use: "Since uncertainties as to the existence of coverage must be resolved in favor of the insured . . . the same facts can result in different conclusions depending upon whether it is in the insured's interest to view the injury as one arising out of the use of an automobile."). Nevertheless, it appears that even

---

[12] While the renewal contract at issue here uses the term "arise from," and not the more common term "arise out of," these two terms appear to be used synonymously. See, e.g., Maroney v. New York Cent. Mut. Fire Ins. Co., 5 N.Y.3d 467, 472, 839 N.E.2d 886, 889-90, 805 N.Y.S.2d 533, 536 (2005) (using "arise out of" and "arise from" interchangeably). Moreover, the New York Court of Appeals has found that "arise out of" and "based on" have substantially the same meaning, reinforcing the conclusion that the more similar phrases "arise out of" and "arise from" are synonymous. Mount Vernon Fire Ins. Co. v. Creative Housing Ltd., 88 N.Y.2d 347, 352, 668 N.E.2d 404, 406, 645 N.Y.S.2d 433, 435 (1996).

under a demanding application of the "arising from" test, the claim in <u>Chevre v. Grunwald</u> and both the claim and counterclaim in <u>Gluck v. Chevre</u> "arose from" the Closing Agreement.

Under New York law, the phrase "arising out of" has been interpreted, in the context of insurance exclusions, to mean "originating from, incident to, or having connection with." <u>Maroney v. New York Cent. Mut. Fire Ins. Co.</u>, 5 N.Y.3d 467, 472, 839 N.E.2d 886, 889, 805 N.Y.S.2d 533, 536 (2005) (applying this definition to a coverage exclusion denying claims that "arose out of" uninsured premises) (quoting <u>Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.</u>, 91 A.D.2d 317, 320-21, 459 N.Y.S.2d 158, 161 (4th Dep't 1983) (adopting this definition in the context of a homeowner liability policy's automobile exclusion clause)). In order for an "arising out of" exclusion to apply, there must be "some causal relationship" between the claim and the excluded subject matter. See <u>id.</u>; <u>see also</u> <u>Worth Const. Co. v. Admiral Ins. Co.</u>, 10 N.Y.3d 411, 415, 888 N.E.2d 1043, 1045, 859 N.Y.S.2d 101, 103 (2008).

In practice, however, what the phrase "some causal relationship" means is less clear. Most courts, and at least one commentator, suggest that it should require something less than proximate causation. See 2 Insurance Claims and Disputes 5th § 11:22.10 & n.28 (indicating that the term "arising out of" should not be construed to mean proximately caused by, and

33

collecting cases from various jurisdictions holding that
"arising out of" requires less than proximate causation).
However, one Second Circuit case described the meaning of
"arising out of" under New York law by tying it to the concept
of proximate cause.  Kimmins, 19 F.3d at 81-83.  In Kimmins, the
Second Circuit first acknowledged that New York courts
understood "arising out of," as used in insurance exclusions, to
have the broad meaning of "originating from, incident to, or
having connection with," and that this requires "some causal
relationship."  19 F.3d at 81-82 (quoting Aetna Casualty, 91
A.D.2d at 320-21).  It then went on, however, to find that even
those New York courts adopting this broader phrasing were in
fact applying a causal test "tantamount to proximate causation,"
whether or not their rulings "were expressed . . . in terms of
proximate causation."  Id. at 82, 83.

However, post-Kimmins, the New York Court of Appeals
continued to state that "arising out of" "only requires some
causal connection," rather than explicitly adopting Kimmins'
view that proximate causation is necessary.  See Maroney, 5
N.Y.3d at 472 (emphasis added).  However, the Maroney court
still used language indicating that more than a tenuous causal
connection is necessary to find that a claim "arose out of" an
exclusion.  Specifically, in discussing why there was a
"sufficient causal connection" to find that an injury "arose out

of" the excluded property at issue, the court described the
injury as "directly related" to the excluded property and found
a "direct connection" between the injury and the excluded
location, but no "direct causal connection" between the injury
and the insured location.  Maroney, 5 N.Y.3d at 473-74.
Ultimately, then, while it remains somewhat unclear exactly what
level of causation is necessary to find that a claim "arose out
of" a particular fact or circumstance, Maroney at least suggests
that New York law requires an inquiry into how "direct" the
causal connection at issue is, though "direct" seems to mean
something less than "proximate."  Id.  The Southern District of
New York recently reached a similar conclusion when considering
a D&O Liability Exclusion under New York law, finding that
"arising out of" has a "broad" interpretation and applying a
"but for" causality test.  See XL Specialty Ins. Co., 2009 WL
1227485, at *9-10.

        Turning to the instant case, the allegations in each
pleading will be discussed in succession to determine whether
there is a "sufficient causal connection" between the claim at
issue and the Closing Agreement to preclude coverage under the
"arising from" exclusion.  Cf. Maroney, 5 N.Y.3d at 473-74.  To
make this determination, the "four corners" of each complaint
and the "four corners" of the counterclaim must be examined to
determine whether the claims clearly fall within the "arising

from" exclusion.  Cont'l Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d

at 648; Frontier Insulation, 91 N.Y.2d at 175.[13]  It happens that

the complaint and counterclaim in the second action, Gluck v.

Chevre, are the most easily treated and will therefore be

examined first.  In short, Gluck v. Chevre plainly arose from

the Closing Agreement.  Indeed, the Closing Agreement was the

driving force behind the dispute that led to the suit.

As noted above, the plaintiffs in Gluck v. Chevre were NSG

and the Disputed Board Members — most of whom were defendants in

Chevre v. Grunwald and are plaintiffs in this action.  Def. Ex.

4 at p. 1.  The defendants were Chevre and Morris Klein.  Id.

The complaint indicates (1) that compliance with the Closing

Agreement was imperative to the survival of NSG and (2) that

compliance necessitated reducing the authority of Chevre over

NSG.  Def. Ex. 4 at ¶ 25-26, 33.

Therefore, as the complaint recites, the Disputed Board

Members took steps to "effectuate the Closing Agreement" by

amending the bylaws and electing new independent directors, and

_____

[13] The plaintiffs at one point argue that coverage should exist
because the claims for which they are seeking coverage do not
relate solely to matters raised in the Closing Agreement.  See
Pl. Mem. of Law in Supp. of Mot. for Partial Summ. J. at 15.
However, this is not the relevant question; rather, as explained
above, the complaints and counterclaim must be analyzed to
determine whether there is a "some causal connection" between
each suit and the Closing Agreement.  The fact that other,
concomitant causes might also exist does not preclude a finding
that the Closing Agreement was one direct cause of the claims in
the underlying actions.

by making Chevre a non-voting member of NSG.  Id. at ¶ 32-33.

Chevre responded to these moves by removing the Disputed Board

Members from NSG's board, first without proper notice and again

after complying with the notice requirements.  See id. at ¶ 37,

45-47.  This removal of the Disputed Board Members led them to

initiate Gluck v. Chevre.  See id. ¶ 50-54.  Accordingly, it is

clear from the complaint in Gluck v. Chevre that the Disputed

Board Member's attempt to implement the Closing Agreement was

the driving cause of the dispute leading to the complaint for a

declaratory judgment.

The counterclaim in Gluck v. Chevre also plainly states

that it arose from the Closing Agreement.  While there were

tensions within NSG's board prior to the Closing Agreement, the

Closing Agreement was the decisive event in triggering the

dispute that led to the counterclaim, because reforms mandated

by the Closing Agreement caused the dispute between Chevre,

Morris Klein and Grunwald.  The Closing Agreement also played a

substantial role in ensuring that the intra-board conflict led

to a law suit rather than being resolved without legal action.

It is helpful to revisit the general sequence of events

alleged in the counterclaim in order to understand why they

arose substantially from the Closing Agreement.  The

counterclaim, after explaining the reforms required by the

Closing Agreement, alleged that Chevre and Klein approached

Grunwald about reducing his compensation and increasing his hours, among other things. Def. Ex. 5 at ¶ 95, 98. Next, Grunwald demanded that his "equity" in NSG be purchased and, following Klein and Chevre's refusal, Grunwald took over NSG's board. Id. at ¶ 99, 102. Next, Chevre disbanded the board, ousting the Disputed Board Members. Id. at ¶ 107. Chevre and Klein then brought the counterclaim with the aim of securing a declaration that the Disputed Board Members, who were acting at the behest of Grunwald, had no authority. See id. at ¶ 103, 107-110.

Based on these events, the plaintiffs argue that the counterclaim arises out of the struggle for control of NSG instigated by Grunwald. This is true, but explains only a selective portion of the cause of the counterclaim. In fact, Grunwald's struggle for control of NSG led him to stack the board and demand an equity buyout specifically because NSG was trying to effectuate the governance changes required by the Closing Agreement, including reducing Grunwald's excessive compensation. See id. at ¶ 90, 95, 98-99, 102-03. Indeed, the counterclaim includes information on the audit of executive compensation required by the Closing Agreement, and then explains that Chevre and Klein told Grunwald that he would "have to" accept decreased compensation. Id. at ¶ 95, 98. This narrative makes clear that the Closing Agreement was central to

sparking the dispute with Grunwald.  Both the information and
the imperative for Klein and Chevre's confrontation with
Grunwald over his compensation – which in turn led to Grunwald's
stacking of the board and the removal of the Disputed Board
Members that the counterclaim seeks to have legitimated – arose
from the Closing Agreement.

In addition to triggering the dispute, the Closing
Agreement was a substantial factor in ensuring that it was not
resolved and instead resulted in a suit.  When Grunwald demanded
that his equity be purchased, Chevre and Klein indicated that
this was not possible because the Closing Agreement forbade it
and they could not take steps that could jeopardize NSG's non-
profit status.  Id. at ¶ 101.  Similarly, when Grunwald stacked
NSG's board with his allies, Chevre and Klein removed these
Disputed Board Members at least partly because they found them
lacking the independence required by the Closing Agreement.  Id.
at ¶ 104.  Thus, there was a direct connection between the
Closing Agreement and the need for Chevre and Klein to respond
to Grunwald's demands with a law suit, in order to prevent a
Grunwald-biased board from violating the Closing Agreement.

To be sure, there were other reasons for Chevre's response
to Grunwald's demands.  New York's non-profit law forbade buying
out Grunwald's equity and Chevre effectively admits its desire
to control NSG.  See id. at ¶ 94, 100.  Thus, Chevre's decision

39

to remove the Disputed Board Members was also driven by its desire to avoid breaches of fiduciary duty by the directors, as plaintiffs argue. However, this is not at all inconsistent with an explanation that the Closing Agreement was also a substantial part of Chevre's motivation for disbanding the board. And the Closing Agreement need not be the only cause of their actions – it need merely have <u>some</u> causal connection. <u>Maroney</u>, 5 N.Y.3d at 472. Here, the Closing Agreement clearly was one of the direct causes of the dispute in the underlying law suits and therefore had the requisite relation.

Plaintiffs also argue — regarding both the complaint and counterclaim in <u>Gluck v. Chevre</u> — that the Closing Agreement was not central because the legal issues in the underlying actions revolved around New York law and not the terms of the Closing Agreement. Plaintiffs point to comments made by the state court in a hearing on the second action indicating that the validity of the Closing Agreement "does not affect questions before this court, which are questions involving the substantive law of this State." Pl. Ex. Q. at. p. 10. This, however, is not germane to the issue in the instant case. The issue here is not what legal standards govern the underlying actions but rather whether they, as a practical matter, arose from the Closing Agreement. For the reasons discussed above, both the second action and the counterclaim plainly did arise from the Closing Agreement, as

the Closing Agreement had a direct causal connection to the suits.

The complaint in the first action bears many similarities to the counterclaim, which is unsurprising since Chevre was involved in bringing both pleadings.  However, whether the first action arose out of the Closing Agreement is a closer question than the counterclaim.  Unlike the counterclaim, the first action does not specifically allege that Chevre and Klein confronted Grunwald about his pay package as a result of the Closing Agreement and does not specifically discuss an audit of executive compensation.  Also, the complaint in the first action attributes to Grunwald a motivation to create conflict within the board that is not necessarily tied to the Closing Agreement: his desire to privatize NSG for his personal benefit.  Ex. 3 at ¶ 29.  It could therefore be argued that the primary cause of the Chevre v. Grunwald dispute was Grunwald's acquisitiveness and not the Closing Agreement.

However, there are sufficient allegations in the complaint in the first action to establish that there was a direct causal connection between the Closing Agreement and the suit.  First, there is an indication that Grunwald's demand that his equity be bought out was triggered by the Closing Agreement.  As in the counterclaim, the first action notes that the Closing Agreement imposed "certain governance requirements."  Id. at ¶ 35.

Grunwald's request to retire and his demand to be bought out are discussed in the very next paragraph in the complaint, strongly implying that these events are connected.  Id. at ¶ 36.

Additionally, the complaint also indicates that the first action plaintiffs said they could not buy out Grunwald's "equity" because it would violate the Closing Agreement, in addition to violating New York non-profit law.  Id. at ¶ 37, 38. This refusal directly resulted in Grunwald's stacking of the board – the central action in dispute in Chevre v. Grunwald. See id. at ¶ 38-39.  The fact that the Closing Agreement played a critical role in justifying Chevre's refusal to negotiate with Grunwald means that the Closing Agreement was a substantial cause of the law suit.

Crucially, the Chevre v. Grunwald complaint also includes the allegation that Grunwald's board violated the Closing Agreement because it was insufficiently independent.  Id. at ¶ 40.  This further establishes that the Closing Agreement was a substantial reason for plaintiffs in the first action to object to Grunwald's attempt to stack the board.  After this, the first action contains the familiar allegations that Chevre wished to prevent any violations of fiduciary duties[14] and that it decided

---

[14] Plaintiffs again argue that because one of Chevre's motivations for removing the Disputed Board Members was to prevent a violation of their fiduciary duties, the Chevre v. Grunwald complaint cannot be said to arise from the Closing Agreement.

to purge the board by removing the Disputed Board Members.  Id.
at ¶ 42, 44.  When the Disputed Board Members continued to act
for NSG, plaintiffs brought suit.  Id. at ¶ 47, 50.  Given the
inference that the Closing Agreement's governance reforms helped
spark the dispute with Grunwald; the fact that the Closing
Agreement was a central reason that Grunwald's demands to have
his equity purchased were rebuffed, causing him to stack the
board; and the fact that Chevre then purged the board in order
to comply with the Closing Agreement, the Closing Agreement
clearly had significant causal import in the first action.
Thus, for the reasons discussed above, all three pleadings had a
substantial causal connection to the Closing Agreement and all
therefore arose from it.  As a result, coverage for all three is
excluded under the insurance policy.

---

However, this allegation does not detract from the causal import
of the Closing Agreement in Chevre v. Grunwald for the same
reasons noted above with respect to the counterclaim in Gluck v.
Chevre.  Additionally, the other arguments raised by plaintiffs
regarding the counterclaim are unpersuasive as applied to the
Chevre v. Grunwald complaint for similar reasons.

## Conclusion

For the reasons stated above, the claims in all three pleadings arise from the Closing Agreement.  They, therefore, fall under the "arising from" exclusion contained in the renewal application.  For this reason, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

Dated: Brooklyn, New York
      January  22, 2010

                  SO ORDERED:


                  _____/s/_____
                  David G. Trager
                  United States District Judge